**TRENK, DiPASQUALE,
DELLA FERA & SODONO, P.C.**
427 Riverview Plaza
Trenton, NJ 08611
(609) 695-6070
(609) 695-6071 – fax
Andrea Dobin
adobin@trenklawfirm.com
*Counsel to Sudhir Budhiraja and Anmol Budhiraja, Debtors*

| | |
|---|---|
| In re:<br><br>SUDHIR BUDHIRAJA and ANMOL BUDHIRAJA,<br><br>Debtors. | Chapter 7<br><br>Case No. 15-25036 (MBK)<br><br>Honorable Honorable Michael B. Kaplan, U.S.B.J. |
| SAURABH AGGARWAL and NEMA JAIN,<br><br>Plaintiffs,<br>v.<br><br>SUDHIR BUDHIRAJA and ANMOL BUDHIRAJA,<br><br>Defendants. | Adv. Pro. No. 15-2323 (MBK)<br><br>**Hearing Date: August 10, 2017**<br>**Hearing Time: 10:00 a.m.** |

### AFFIDAVIT OF SUDHIR BUDHIRAJA IN LIEU OF DIRECT TESTIMONY AT TRIAL

**SUDHIR BUDHIRAJA**, of full age, duly sworn upon his oath says:

1. I am one of the debtors and defendants in the above-referenced matters. I make this statement in lieu of providing my direct testimony at trial. Except as noted, I have personal knowledge of the facts set forth herein.

2. Prior to the time period relevant to the within litigation, my wife, Anmol Budhiraja ("**Anmol**") owned and I operated a plastics and metal recycling business called

North America Recycling, Inc. ("**NAR**") The business previously had operated as an LLC. We had closed that business and formed NAR to enable us to get credits as a woman-owned business. The plastics business is impacted by fluctuations in gas and oil prices. It is a very volatile business which, because my wife didn't work, created an unacceptable level of financial risk and uncertainty for my family.

3. In 2007, my wife and I explored the idea of opening a daycare, but it was abandoned when my wife became gravely ill. We created "Little Steps Management, LLC" ("**LSM**") at that time. My wife gave birth to twins in 2010 which caused a further delay in those plans

4. When my children were old enough to be cared for by someone other than my wife, we considered having her return to work and operate a business that would provide our family with a more steady income flow unaffected by the changes in gas and oil prices. The first option we considered as a daycare. We sought to open a franchise in a particular location. We were never able to get the approvals we needed to move forward with that business. In fact, we lost money pursuing that opportunity.

5. Our next thought was to purchase a liquor store. I found the business that was for sale located at 343 Highway 34, Matawan, New Jersey and entered into a letter of intent for that purchase on March 1, 2013. **EXHIBIT 31.**

6. Around that same time I had renewed my friendship with Saurabh Aggarwal ("**Aggarwal**"), a childhood friend from my time in India who had moved to the United States. He and I would discuss various business opportunities; he appeared to be intrigued by my entrepreneurial activities.

7. As I was considering the purchase of the liquor store, Aggarwal offered to become involved. I knew that I would need investor money because NAR was struggling, so I agreed partner with him on this acquisition.

8. Aggarwal knew that NAR was struggling; he had lent money to it on repeated occasions by then. **EXHIBIT 1 (f/k/a Plaintiff A).**

9. Aggarwal and I were each 50% owners of the corporation that I formed to buy the liquor store, to be known as Wine 34, Inc. ("**Wine 34**"). We executed the corporate resolution to purchase the liquor store assets on or about February 28, 2013. **EXHIBIT 32.**

10. On May 13, 2013, Wine 34 agreed to purchase the assets of MSJP Associates, LLC. Aggarwal signed the Purchase and Sale Agreement ("**Purchase Agreement**') in his capacity as president. At that point, I was still a 50% shareholder. **EXHIBIT 2 (f/k/a Plaintiff B).**

11. The $20,000 deposit referenced in the Purchase Agreement was funded by a loan from Adit Jawa to Wine 34. As early as May, 2013, Aggarwal knew that I did not have the funds necessary to be a financial contributor to the acquisition of the liquor store. If I had the funds available, we wouldn't have needed to borrow the deposit monies from Adit Jawa.

12. By June, 2013, we had concluded that my personal financial condition was such that remaining as an owner of Wine 34 would make it more difficult for us to get the transfer of the liquor license approved. When Aggarwal signed the application to transfer ownership of the liquor license, he held himself out as the sole shareholder to facilitate the transaction.

13. I did not receive any payment in exchange for my forfeiture of my 50% ownership interest in Wine 34 – the business that I formed from an idea that I had. I willingly agreed to it as part of a much larger business plan.

14. To explain, my faith in the future of NAR was shaken. I decided that a retail business was the future of my family. Aggarwal agreed with me. The "plan" was that we would buy Wine 34; it would be wildly successful and we would leverage that success into buying a series of liquor stores. Following the purchase of a second liquor store, we would equalize the ownership back to 50/50.

15. The Purchase Agreement was contingent on our ability to get financing. It was harder than we expected to get financing for a liquor store. We thought that getting funds for the purchase of an operating business would be a relatively easy. It was not.

16. Aggarwal and I found ourselves with limited financing options and were forced into less attractive borrowing options and having to use NAR's financial history (at least it had some) in order to induce lenders to fund. In fact, the size of the financing required to purchase the assets of Wine 34 was such that we could only borrow that in the name of NAR.

17. Since Aggarwal owned Wine 34 and the debt was being incurred by NAR to purchase the assets to be held by Wine 34 (subject to Aggarwal's personal guaranty), I agreed to transfer NAR to Aggarwal. Our agreement was founded on the theory that since he was personally guaranteeing debt owed by NAR, he should own it.

18. Our understanding was that once the debt was paid off and Aggarwal's personal guaranty was released, Anmol would get ownership of NAR back.

19. Aggarwal did not pay me or my wife anything for receipt of the ownership of NAR, a company we owned and operated for three years.

20. Aggarwal did not ask for any financials of NAR. He was only interested in its ability to borrow money in order to finance the purchase of assets by Wine 34.

21. After he became the titled owner of NAR, he showed no greater interest in the financial health of NAR than he did before. He never asked for financial reporting of any sort except to the extent necessary to obtain additional financing.

22. In October, 2013, *five months after the Purchase Agreement was signed*, Aggarwal submitted the loan application from NAR to Savoy Bank asking for a working capital loan. **EXHIBIT 5 (f/k/a Plaintiff E)**. NAR did not need $300,000 of working capital for *its* operations. That loan was always intended by Aggarwal to be used to fund the acquisition of the liquor store by Wine 34.

23. In order to obtain that funding, Aggarwal directed the fraudulent increase of the accounts receivable listing. He was in direct contact with our lenders and their agents. He contacted me and asked if we could increase the amount of accounts receivable on the NAR books to facilitate the Savoy Bank loan. I did as directed; he was the owner and would be personally guaranteeing this loan. **EXHIBIT 33**.

24. We knew that there was a chance that even the money from Savoy Bank would not be enough to fund the purchase of the liquor store. Thus, in January, 2014 Aggarwal had NAR apply to Business Backers for another loan which he guaranteed. **EXHIBIT 34**.

25. The proceeds of the Savoy Bank loan, the Business Backers loan and a loan from Kalamata Capital were all received by NAR in the weeks preceding the closing of the Wine 34 transaction. **EXHIBIT 35.**

26. The funds lent to NAR needed to be transferred to Wine 34 in advance of the closing. This happened in a series of transactions that set the stage for how NAR, Wine 34, Aggarwal and I handled the finances for NAR and Wine 34 from that point forward:

   a. By February 21, 2014, NAR had borrowed, in the aggregate, approximately $350,000 and was holding those funds in its bank account (**EXHIBIT 35**).

   b. On February 21, 2014 NAR wired $50,000 directly to Wine 34 (**EXHBIIT 36**).

   c. NAR transferred $202,500 to <u>LSM</u> as follows - **EXHIBIT 35**:

      i.   February 7, 2014: $59,000
      ii.  February 7, 2014: $50,000
      iii. February 20, 2014: $93,500

   d. <u>LSM</u> transferred $200,000 <u>to Aggarwal</u> as follows - **EXHIBIT 35**:

      i.  February 10, 2014: $105,000
      ii. February 20, 2014:  $95,000

27. We consummated the purchase of Wine 34 on February 28, 2014.

28. None of the funds used to purchase the liquor store assets came from me <u>or</u> <u>Aggarwal</u>. All of the money was borrowed from various lending sources, friends of Aggarwal and, at the last minute, the seller (who accepted a promissory note in lieu of payment of the final portion of the purchase price).

29. Some of the money borrowed for the acquisition came from one of Aggarwal's friends, Adit Jawa ("**Adit Jawa**"). By April, 2014, NAR, Wine 34, Aggarwal and/or I had four different loans outstanding to Adit Jawa. **EXHIBIT 38**.

30. To be clear, the majority of the debt that funded our acquisition of the liquor store assets was all due and payable by NAR, *not Wine 34*.

31. Anmol operated Wine 34 post-closing. I continued to operate NAR.

32. The structure of the debt on Wine 34 and NAR was such that the income from Wine 34 was necessary to pay these loans. However, the structure of these obligations was such that I could not simply have Wine 34 pay, for example, Savoy Bank.

33. Savoy Bank required that NAR maintain a bank account at Savoy Bank from which the payment on the loans was deducted. NAR needed to get the money from Wine 34 into its account at Savoy Bank to pay this debt. Thus, it was imperative that Wine 34 transfer funds to NAR. This was true for the other debt incurred by NAR for the benefit of Wine 34 as well.

34. Similarly, to the extent that Wine 34 needed capital (as a start-up business frequently does), funds needed to flow from NAR (if it had any) to Wine 34. This is why financial records of Wine 34 and NAR show significant funds flowing back and forth between them.

35. With this debt structure, I had concerns that the various lenders (in particular Savoy Bank whose bank records were readily available to it) would question why there were always funds coming from a liquor store into the funds of a recycling company. Aggarwal had made representations to Savoy Bank about the use of the funds we had borrowed; I needed to protect him against having the loan called.

36. To shield us from criticism, I started periodically wiring funds from Wine 34 to LSM before wiring them to NAR (for payment to Savoy Bank and others). LSM's name is sufficiently vague to avoid scrutiny. The LSM bank account was not being actively used. There was no reason not to use it for this purpose.

37. Aggarwal submits **EXHIBIT 14 (f/k/a Plaintiff N)** in an effort to prove that NAR sent funds to LSM, i.e., that it was only a one-way relationship. However, this is exhibit is faulty and does not prove what he believes it proves:

   a. Exhibit 14/N has page numbers. The first page bears page 1, the second page bears page number 3, the third page is page number 5, etc. In other words, it is incomplete and cannot be relied upon to provide a complete picture of NAR's financials.
   b. Exhibit 14/N is titled "Transaction Detail by Account". Aggarwal calls it NAR's "General Ledger" (para. 31 of Aggarwal's Affidavit). That is not what the document calls itself. He is not qualified to call the document something that it does not call itself.
   c. Exhibit 14/N shows significant payments by NAR directly to Wine 34 and to creditors whose funds were used to buy Wine 34, i.e., Kalamata Capital. The relationship between NAR and Wine 34 is inescapable. These entries support my explanation of the way that the funds flowed.
   d. Exhibit 14/N does not show the transfers by LSM to NAR that actually happened during 2014. By way of example, I am providing a copy of LSM's bank account for September, 2014 which shows transfers totaling more than $54,000 to NAR by LSM during that one month. Not all of these transfers appear on Exhibit 14/N. **EXHIBIT 39.**
   e. Some of the transfers by LSM to NAR demonstrated on Exhibit 39 do not appear on the Citibank bank account statements included in Exhibit 14/N. The reason is simple; NAR had other bank accounts, including one at Savoy Bank. Aggarwal has not provided the Court with these statements. Aggarwal is intentionally or unintentionally hiding the true picture of the financial relationship between and among NAR, Wine 34 and LSM and trying to mislead the Court.
   f. Aggarwal has had unfettered control to the NAR financial information and the Wine 34 financial information since at least May, 2015 and has, based on what is before this Court, not engaged an accountant to trace the funds between and among NAR, Wine 34, and LSM. I believe that this kind of accounting review would completely discredit his allegations.

8

38. Anmol and I were managing Wine 34 and NAR through the spring and summer of 2014. However, the debt that Wine 34 had incurred was difficult to service. It repeatedly left both NAR and Wine 34 starved for cash and frequently "robbing Peter to pay Paul".

39. Every morning I would send a text to Aggarwal with the balance in the bank account of each business.

40. By May, 2014 (three months after the sale closed), we were declared in default by some creditors and in June, 2014 (four months after the sale closed), NAR, Wine 34 and Aggarwal were sued by Kalamata Capital in Maryland as a result of our inability to fund all of this debt. **EXHIBIT 40.**

41. In August, 2014, Business Backer filed suit. **EXHIBIT 41.**

42. I was doing my best to keep things moving forward, including getting some new credit to retire the old debt and buy us time to build the liquor store business.

43. In October, 2014, Aggarwal told me that he wanted out of both NAR and Wine 34. The stress of the struggling businesses had gotten to him. Kalamata had gotten a judgment against him. He wanted me to pay off the debt that he had guaranteed and give him money. Anmol and I would regain ownership of both of the businesses if we did that.

44. Between October, 2014 and February, 2015, we negotiated the terms of the buyout, which was memorialized in two Stock Purchase Agreements. I signed the one that was the repurchase of the stock for NAR (the "NAR SPA"). Anmol signed the Stock Purchase Agreement for Wine 34. **EXHIBIT 11 (f/k/a Plaintiffs K).**

45. At the time I signed the NAR SPA, Aggarwal knew that neither I nor NAR nor Wine 34 had the money necessary to make the payments due under the NAR SPA. He

9

knew everyone was being sued. He knew we didn't have any money when we bought Wine 34; we were not in a better position now.

46.  I wanted to repurchase NAR and Wine 34. Even he admitted that. **JOINT EXHIBIT "C" 132:18-21.**

47.  Aggarwal knew that I was intending to borrow from Itria to meet my obligations under the NAR SPA. In fact, we agreed to amend the payment terms under the NAR SPA to be able to accommodate the limitations that Itria imposed on my ability to borrow money. Itria could not lend money on the time frame set out in the NAR SPA. **EXHIBIT 42.**

48.  Aggarwal told me that Adit Jawa was pressing him for payment. Adit Jawa called me too. **EXHIBIT 43.**

49.  In order to fund the payment to Adit Jawa, NAR and Wine 34 borrowed money from Itria Ventures, LLC in March, 2015 ("**the 2015 Itria Loan**"). The proceeds of the 2015 Itria Loan were wired by Itria to Aggarwal's attorney's trust account. **EXHIBIT 44**[1]

50.  Adit Jawa received proceeds of the 2015 Itria Loan in partial satisfaction of the debt due to him from Wine 34, Inc. **EXHIBIT 45**[2]

51.  The 2015 Itria Loan did not affect the balance sheet of Wine 34 – the proceeds of it were used to satisfy another outstanding obligation of Wine 34, that of Adit Jawa.

52.  Although the 2015 Itria Loan was a secured transaction, a UCC-1 was filed by Itria against the assets of Wine 34 in April, 2014 (approximately one year earlier). In

---

[1] This Exhibit has a December, 2015 date as it appears to have been generated in connection with litigation. Ed Weissman is an attorney representing Itria Ventures in its state court litigation. See Exhibit 20 f/k/a Plaintiffs T
[2] The receipt from Adit Jawa is inexplicably dated March 20, 2015. He did not receive the funds until after the funds were received by Aggarwal's counsel.

10

fact, none of the UCC-1s submitted to this Court as **EXHIBIT 23 (f/k/a Plaintiffs W)** are related to the 2015 Itria Loan, they are all from 2014.

53. I did what I could to raise the funds to make the payments due under the terms of the NAR SPA. An issue arose during the Memorial Day weekend of 2015. Memorial Day that year was Monday, May 25. I was due to make a payment on Wednesday, May 20. I admit that I did not make the payment on Wednesday, May 20. There were problems getting the funds from Itria, and having them clear due to the banking holiday. I repeatedly told Aggarwal that the funds would be paid on Tuesday, May 26.

54. I was distressed to discover that the NAR SPA did not give me any leeway in the ability to make payment. Once May 20 passed, Aggarwal refused to give me the right to cure the default. Instead, Aggarwal descended upon Wine 34 and threw both my wife and I out – physically – on May 22, 2015. I've not stepped foot back into Wine 34 since then. I have cooperated in the turnover of possession of both businesses.

55. Aggarwal has not told the Court about the money he received under the SPA, electing to ignore that. By the time he called a default in May, 2015, in addition to paying the obligation to Adit Jawa ($147,500 which he would have had to pay), my wife and I paid a large number of obligations that he owed personally. See **EXHIBIT 42.** When he took back the businesses, he got a windfall. He was relieved of the personal debt but kept the businesses.

56. My wife and I received promissory notes for the money we paid under the two SPAs, as called for under the terms of the Indemnity and Assumption Agreement executed as part of the transactions (**EXHIBIT 11 – f/k/a Plaintiff's K**), but the

11

promissory notes are not due from Aggarwal personally; they are due from Wine 34 and NAR which he has run into the ground. The Promissory Notes are now worthless.

57. I filed a bankruptcy petition when I discovered that Aggarwal would not be operating Wine 34 and NAR in a way to pay the obligations that I had personally guaranteed and/or pay the promissory notes that he signed as part of the Indemnity and Assumption Agreements, but, instead, would file suit against me.

58. In both state court and here (until he prepared for trial), Aggarwal has alleged that I am liable to him for $801,636.04. **EXHIBIT 46.**

59. I did not sign the SPA or Indemnity and Assumption Agreement for Wine 34, I cannot be held responsible for the obligations to pay the Wine 34 debt.

60. Aggarwal's failure to operate NAR and/or Wine 34 successfully after he threw me and my wife out, resulted in our incurring personal liability for debts that should have been paid through those businesses.

61. Aggarwal has had the opportunity to sell the assets of Wine 34, including the liquor license, for a large amount of money ($150,000 or more). No information about this process has been disclosed that to this Court.[3]

62. Aggarwal wants to hold me responsible for debts that he and/or Wine 34 have the ability to satisfy.

---

[3] Upon information and belief, the creditors of Wine 34 have taken action to prevent Aggarwal from receiving the proceeds of sale of the liquor license held in the name of Wine 34. It appears that they were concerned that he would not use the proceeds to satisfy the valid claims against the company.

**As to Claim to Bar Discharge Pursuant to 11 U.S.C. §727**

63. On the recommendation of anther attorney, Anmol and I retained Ronald Reich ("**Reich**") to represent us in our bankruptcy proceeding. We had never been involved in a bankruptcy proceeding and relied upon him to prepare the paperwork properly.

64. We provided him with all of the information he requested and assumed that if he needed additional information from us, he would ask.

65. I did not see the final version of the bankruptcy petition, schedules or statement of financial affairs until I was asked to sign it all in the hallway before my wife and I entered the room for the First Meeting of Creditors. **JOINT EXHIBIT "E" 23:8-14.**

66. I was surprised when during the First Meeting of Creditors, it became clear that there was information that was supposed to be on the bankruptcy petition and schedules that was not there. We testified about these items and, once the First Meeting was over, provided a large quantity of documents to Reich which he, thereafter provided to the Trustee. **EXHIBIT 47.**

67. I now know that the information in these documents should have been incorporated into amended schedules and an amended Statement of Financial Affairs and, thereafter, filed with the Bankruptcy Court. I was not aware of this requirement and assumed that my extensive truthful testimony (which, admittedly, included items that were not on the schedules and statement of financial affairs) was enough. **JOINT EXHIBIT "D"**.

68. I trusted that Reich knew what needed to be done and was doing it.

69. Apparently (and based on his testimony), Reich did not think that the schedules needed to be amended either. **JOINT EXHIBIT "E" 40:16-41:1.** Now I am being held responsible for the fact that although I testified truthfully <u>and</u> provided voluminous

13

documents to my counsel which were provided to the Trustee, the schedules and Statement of Financial Affairs were not amended.

70. The Trustee extensively investigated my financial affairs. The Trustee repeatedly told the Court that it had "voluminous" records to review. See, e.g., Main Case Docket No. 44-1, para. 18.

71. Furthermore, the Trustee's accountants expended more than $40,000 and <u>over 200 professional hours</u> assisting the Trustee in the performance of his duties in this case. Even a cursory review of the Accountant's fee application demonstrates the diligence with which they proceeded to investigate whether there were assets available for creditors resulting from my failure to disclose facts to the Trustee. See, Main Case Docket No. 136.

72. The Trustee did not find any assets to liquidate with the exception of preference to Discover Card and a small alleged fraudulent transfer (because I paid an obligation of a family member). See Main Case Docket No. 140, p. 3-7.

73. The Trustee did not even depose me.

74. I did not engage in fraud or fail to make any meaningful disclosures.

75. I can now address certain details that are suggested to constitute fraud.

    a. At the time the bankruptcy was filed, Anmol and I were driving a minivan titled in Anmol's sister's name. She graciously allowed us to use the car if we made the monthly payment for it. It is not and never was our vehicle.
    b. Little Steps Management never "operated". It was a vehicle for the transfer of money as extensively discussed herein.
    c. Rainbow Events is not a separately incorporated entity, but was a name that Anmol used for an annual fundraiser she ran.
    d. Spura Corp. is a start-up retail company that has no value to anyone but me. At the time of the bankruptcy filing it was 2 months old and had no assets. I was hopeful to take a salary of $3,000 per month. It is still in the earliest stages.

**Summary**

76. I didn't force Aggarwal to go into business with me. I didn't force him to incur debt in order to do so. I didn't lie to him about anything. He had unfettered access to any records he wanted. He was the <u>owner</u> of NAR. He could <u>fire me</u> if he thought I wasn't giving him access to records that he wanted or I was lying.

77. Owning a business is risky. Owning a business with a lot of debt is riskier.

78. Since he made that first loan to me early in 2013, Aggarwal knew that I did not have access to a lot of funds. He now contends that he was misled into believing that I had funds to close on the purchase of Wine 34. I never told him that. He <u>knew</u> it wasn't true. We <u>both</u> borrowed the money for the <u>deposit</u> to purchase Wine 34.

79. Aggarwal was used to going to work and getting a paycheck. He could not handle the stress of a financially strapped business. He didn't realize how hard it is to operate a business….any business. I knew. I was prepared for the ups and downs.

80. If I am guilty of anything, I am guilty of getting some monumentally bad advice, both financial and legal.

    a. When we could not borrow money in the name of Wine 34 for the purchase of the liquor store, I should have been counselled against leveraging NAR to buy it anyway.
    b. When Aggarwal wanted out, I should have negotiated a better deal. The structure of the deal allowed Aggarwal to just <u>take</u> the business back without my being able to protect myself in a court proceeding or get the money back.
    c. <u>Most importantly</u>, the SPA needed to provide me with a right to cure any payment default under the terms of the SPA. I know now that is standard. A 3 business delay in payment should not have given Aggarwal the right to <u>keep all of the money I had already paid</u> and take both businesses.
    d. When I filed my bankruptcy petition, I needed to find a better lawyer who wouldn't jeopardize my ability to get a fresh start.

81. I was looking forward to having a business partner whose apparent appetite for entrepreneurship matched my own. I was mistaken. Aggarwal wants to blame me for his

decision-making. He may *now* regret his business decisions. However, at the time, *he* knew *exactly* what he was doing; he didn't rely on me.

82. No one *forced* him to take back the businesses. **He wanted them**. This is many of the decisions he made that he now regrets.

83. I believe had he accepted the payment 3 days late, Anmol and I would have been able to turn around the fortunes of Wine 34 and negotiated our way out of the financial crises we were in. By the time he threw us out, I had already done a lot of the groundwork for negotiating out the debt. I had already paid off Kalamata.

84. My wife and I need a fresh start for our family. We have two children – 7 year old twins. I need the ability to support them.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

4842-7551-0091, v. 1

_____
Sudhir Budhiraja

Sworn and subscribed before me

On this ___26th___ day of July, 2017

_____
Terri E. Olsen, Notary Public

My Term Expires:

TERRI E. OLSEN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES MAR 15, 2020